IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

ADAIR TOSTON                                                                            PLAINTIFF

v.                                        Civil No. 6:20-cv-6077

LIEUTENANT WALTER, Ouachita River
Correctional Unit ("ORCU"); and CAPTAIN
DALLAS, ORCU                                                                            DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed *pro se* by Plaintiff, Adair Toston, under 42 U.S.C. § 1983.

Before the Court is a Motion for Summary Judgment filed by Defendants.  (ECF No. 21).  Plaintiff

has filed a Response in opposition to the motion.  (ECF No. 33).  Pursuant to the provisions of 28

U.S.C. § 636(b)(1) and (3)(2011), the Honorable Robert T. Dawson, United States District Judge,

referred this case to the undersigned for the purpose of making a Report and Recommendation.

## I. FACTUAL BACKROUND

Plaintiff is currently incarcerated in the Arkansas Division of Corrections ("ADC"),

Grimes Unit, in Newport, Arkansas.  (ECF No. 28).  His claims in this action arise from alleged

incidents that occurred on January 10, 2020, while he was housed at the Ouachita River Unit

("ORU") of the ADC in Malvern, Arkansas.  (ECF No. 10).

On January 10, 2020, at approximately 9:00 a.m., Corporal Gregory McDonald and

Sergeant Steven Mason observed Plaintiff had covered the window in his cell with notebook paper.

(ECF No. 21-2, p. 3).  When Plaintiff refused several direct orders from Corporal McDonald and

Sergeant Mason to take the paper off his window, Lieutenant Walter was called to Plaintiff's cell.

*Id.*

1

According to his affidavit, Lieutenant Walter went to Plaintiff's cell, gave him several direct orders to remove the paper from his cell window, but Plaintiff refused to comply with his orders.  (ECF No. 21-2, p. 3).  Lieutenant Walter then contacted Plaintiff's counselor and advised him of the situation.  Plaintiff's counselor came to his cell and attempted to counsel with him.  Lieutenant Walter testified Plaintiff would not speak to his counselor.  *Id.*  Lieutenant Walter then called Captain Dallas and advised him of the situation.  Captain Dallas and Major Cornelius Christopher then came to Plaintiff's cell and attempted to counsel with him.  *Id.*

Plaintiff continued to refuse orders to remove the paper from his cell window and Lieutenant Walter then requested authorization to use force to make sure Plaintiff was not harming himself inside his cell.  At approximately 9:18 a.m., Lieutenant Walter received medical clearance for the use of chemical agents on Plaintiff.  He also obtained authorization from mental health for the use of chemical agents.   At approximately 9:40 a.m., Major Christopher authorized Lieutenant Walter to use chemical agents on Plaintiff.  (ECF No. 21-2, p. 3).

Lieutenant Walter then gave Plaintiff two direct orders to uncover his window, come to the door of his cell, and accept hand restraints.  (ECF No. 21-2, p. 3).  Plaintiff did not comply, and Lieutenant Walter states he then gave Plaintiff a final direct order to uncover his window and submit to hand restraints or chemical agents would be used against him.  *Id.* at p. 2.  When Plaintiff did not comply, Lieutenant Walter opened the food trap door to Plaintiff's cell and sprayed a burst of chemical agent into his cell.  After administering the chemical agent, Lieutenant Walter gave Plaintiff several more direct orders, but he still refused to comply.  *Id.*

At approximately 9:44 a.m., Lieutenant Walter gave Plaintiff a final direct order to uncover his window, come to the door, and accept hand restraints or chemical agents would be used again.

When Plaintiff still refused to comply, Lieutenant Walter states he sprayed another burst of chemical agent into his cell.  After the second burst of chemical agent was administered, Plaintiff complied and removed the paper from his window.  (ECF No. 21-2, p. 2).

Lieutenant Walter testified he then ordered Plaintiff to strip down, come to the door and submit to hand restraints but Plaintiff did not comply with his order.  At approximately 9:48 a.m., Lieutenant Walter gave Plaintiff another direct order to strip down, come to the door and accept hand restraints.  Plaintiff again refused to comply.  Lieutenant Walter states he then administered another burst of chemical agent into his cell.  (ECF No. 21-2, p. 2).  Plaintiff then complied and stripped down out of all his clothes.  Once he stripped down, Plaintiff was placed in hand restraints, removed from his cell, and placed in the shower where he was given water to decontaminate.  *Id.*

At approximately 10:40 a.m., Plaintiff was removed from the shower and taken to medical for an evaluation.   However, Plaintiff refused medical treatment.  (ECF Nos. 21-2, p. 2 and 21-12).  Afterwards, Plaintiff was placed on behavior control without further incident.  *Id.* at p. 4.

The use of force against Plaintiff on January 10, 2020, was recorded on video.  (ECF No. 21-8).  The video footage confirms Lieutenant Walter's description of the incident.

Lieutenant Walter testified he does not remember whether any female staff members were present when Plaintiff was removed from his cell and placed in the shower.  (ECF 21-2, p. 2).

According to his affidavit, Captain Dallas was present during the use of chemical agent against Plaintiff to ensure proper protocols were followed.  (ECF No. 21-3, p. 2).  He also states he does not remember if any female staff members were present when Plaintiff was removed from his cell.  *Id.*

Richard Ball is the Deputy Warden at the ORU.  (ECF No. 21-4).  In his affidavit he states

on January 10, 2020, the use of force on Plaintiff was authorized for the use of chemical agents on Plaintiff. *Id.* at p. 1. Following the use of force, Deputy Warden Ball reviewed the camera footage and staff report. Upon review, he found the ORU's staff used the necessary force to receive compliance from Plaintiff. He then requested a review by Internal Affairs. *Id.* at pp. 4-5.

Raymond Naylor is the Internal Affairs/Disciplinary Hearing Administrator for the ADC. (ECF No. 21-5). On January 17, 2020, his office received a request from Deputy Warden Ball for a review of the January 10, 2020, use of force incident involving Plaintiff. According to his affidavit, Naylor states the staff involved or who witnessed the January 10, 2020, use of force filed the appropriate reports and based on a review of the file, including the camera footage, his office determined the level of force used by the ORU's staff was appropriate. *Id.* at p. 4.

On July 23, 2020, Plaintiff filed the instant lawsuit naming Lieutenant Paul Walter and Captain Bryant Dallas as Defendants. (ECF No. 1). However, Plaintiff neglected to sign his complaint. On September 2, 2020, Plaintiff returned his signed complaint to the Court, and it was docketed as his Amended Complaint. (ECF No. 10). Plaintiff alleges Defendants Walter and Dallas used excessive force against him when a chemical agent was released into his cell. He also claims Defendants violated his reasonable expectation of privacy while he was using the restroom in his cell, and conducted an unreasonable strip search on him. *Id.* at pp. 4-7. Plaintiff also states he did not file any grievances relating to his claims because "fear of retaliation". *Id.* at p. 2. Plaintiff seeks monetary relief from Defendants and is suing them in their official and personal capacities. *Id.*

Terri Grigsby Brown is the Inmate Grievance Supervisor for the ADC. (ECF No. 21-6). Her job responsibilities include responding to non-medical inmate grievance appeals for the

current and former ADC Chief Deputy Directors and Assistant-Directors. *Id.* at p. 1. Brown reviewed Plaintiff's non-medical grievance appeal files and grievance history. During her review, she searched for any exhausted non-medical grievances filed from January 10, 2020, through July 23, 2020, pertaining to Plaintiff claims in the present lawsuit. She also searched for any exhausted non-medical grievances, filed from January 10, 2020, through July 23, 2020, that specifically named or referred to Lieutenant Walter or Captain Dallas. *Id.* at p. 7.

During her review, Brown found that Plaintiff did not file or fully exhaust any grievances against Defendants Walter or Dallas pertaining to the claims in the present lawsuit. She also testified Plaintiff did not complain in any grievance about any action or inaction on the part of either Defendant. (ECF No. 21-6, p. 7).

On April 9, 2021, Plaintiff gave his sworn testimony during a deposition. (ECF No. 21-1, pp. 1-38). He stated that inmates will put paper in their cell window when they use the bathroom. "They're saying I covered the entire window or you can't be doing that…but they didn't have to mace me because of that…I just thought that was kind of extreme." *Id.* at p. 13. In addition, Plaintiff admitted Defendant Dallas gave him an order to remove the paper from his window and he did not comply with that order. *Id.* at 14-15. He also admitted he was given an order to come to the door of his cell. *Id.* at p. 15.

Plaintiff also testified in his deposition he has been diagnosed with schizophrenia. (ECF No. 21-1, p. 6.) Plaintiff stated he did not comply with the orders given to him at first because he was not on his medication. He also stated at the time, he was hearing voices and hallucinating. *Id.* at p. 15. Plaintiff also states "…not one time did they give me a order that they would use chemical elements, such as mace me or anything." *Id.* at pp. 15-16.

5

During his deposition, Plaintiff was allowed to watch the video footage of the entire January 10, 2020, incident.  After watching the video, Plaintiff admitted he was given an order to strip down, he failed to comply, and was sprayed again with chemical agent.  (ECF No. 21-1, pp. 18-19).  In addition, Plaintiff admitted he had stripped himself down and neither Defendant Walter nor Defendant Dallas strip searched him.  He also testified he remembers the counselors being present but he does not remember if any female officers were present when he was removed naked from his cell and placed in the shower.  *Id.* at pp. 26-27.   Plaintiff also stated after he was taken to the shower he was taken to the infirmary but "…I refused the infirmary…because I knew they wasn't going to do nothing, and there wasn't really nothing they could do."  *Id.* at p. 18.

During his deposition Plaintiff also testified he did not file any grievances following the incident that occurred on January 10, 2020.  (ECF No. 21-1, p. 21).

On June 3, 2021, Defendants filed a Motion for Summary Judgment arguing they are entitled to summary judgment because: 1) sovereign immunity bars Plaintiff's claims for monetary relief from Defendants in their official capacities; 2) Plaintiff did not exhaust his administrative remedies against Defendants before filing the instant lawsuit and therefore his claims are barred; 3) Plaintiff cannot establish that either Defendant Walter or Dallas violated his constitutional rights; and 4) Defendants are entitled to qualified immunity.  (ECF No. 21).  Defendants also filed a Brief and a Statement of Facts in support of the motion.  (ECF Nos.  22, 23).

On July 26, 2021, Plaintiff filed a Response in opposition to the summary judgment motion.  (ECF No. 33).

## II.  ADC/ORU POLICIES AND PROCEDURES

At all times referenced in the instant lawsuit, the ORC as a unit of the ADC had policies in

place regarding the filing of grievances by inmates and the use of force by its officers.

### A. Grievance Policy

Administrative Directive 19-34 ("AD 34") provides ADC inmates in its custody an administrative process for the resolution of complaints, problems, and other issues. (ECF No. 21-7, p. 1).  The policy is designed to solve problems at the lowest level, as promptly as feasible, and in a manner that is fair, reasonable, and consistent with the ADC's mission.  *Id.*  The policy requires inmates to "write a brief statement that is specific as to the substance of the issue or complaint to include the date, place, personnel involved or witnesses, and how the policy or incident affected the inmate submitting the form."  *Id.* at p. 6.

The ADC's inmate grievance procedure consists of three steps.  Step-One is known as the Informal Resolution Procedure which requires an inmate to first seek an informal resolution by submitting a Unit Level Grievance Form within fifteen days of the alleged incident to the designated problem solver. (ECF No. 21-7, pp. 6-9).  After attempting to resolve their issue through Step-One, the inmate may proceed to Step-Two, known as the Formal Grievance Procedure by filing a formal grievance on the same Unit Level Grievance Form used during Step-One.  (ECF No. 21-7, pp. 9-11).  Upon receipt, the Grievance Officer will complete the form by assigning a number to the grievance and logging the date the grievance was received, the inmate's name, ADC number, type of grievance, and the text of the inmate's complaint into the Electronic Offender Management Systems ("eOMIS").  *Id.* at p. 9.  An inmate will receive a response to his formal grievance from the warden or the warden's designee within twenty (20) working days.  *Id.* at p. 11.  If the inmate is not satisfied with the warden's response, the inmate may proceed to Step-Three and file an appeal within five (5) working days to the Chief Deputy/Deputy/Assistant

Director.

An inmate's appeal must be written in the space provided on the original Warden/Center Supervisor's form, the Health Services Response to the Unit Level Grievance Form or the Acknowledgement or Rejection of the Unit Level Grievance Form. (ECF No. 21-7, p. 12). To complete the appeal, the inmate must state a reason for disagreeing with the warden, Health Services Administrator, or Mental Health Supervisor's decision and date, sign, and write his ADC number on the attachment being appealed. *Id.*

The ADC's entire grievance process is to be completed within seventy-six (76) working days. (ECF No. 21-7, p. 14). The policy explicitly states that inmates are required to exhaust their administrative remedies as to all defendants at all levels of the grievance process before filing a lawsuit or their lawsuit may be dismissed immediately pursuant to the exhaustion requirement of the Prison Litigation Reform Act. *Id.* at p. 19. To fully exhaust administrative remedies, the inmates are required to timely file an informal resolution, a formal grievance, and a grievance appeal and receive a decision addressing the allegations contained in the grievance at each level. (ECF No. 21-6, p. 7).

**B. Use of Force Policy**

The use of force policies in effect during the time in question in the instant lawsuit are Administrative Regulation 409 ("AR 409") and Administrative Directive 17-06 ("AD 71—06"). (ECF Nos. 21-10, 21-11). The policies authorize the use of force only to the extent necessary to maintain order and discipline, and to ensure the safety of persons and security operations. Force is defined as a directed movement or overt action with or without weapons or devices with intention of restraining, regaining, maintaining control of an inmate. Force may be used to restrain,

regain, or maintain control of an inmate with a minimum of injury to staff, inmates, or others but shall never be used as a means of punishment. (ECF No. 21-9, pp. 1-2). The policies also authorize the use of chemical agents when the use of non-deadly force is necessary. This use of force may be used in situations including but not limited to prevent injury – including self-injury – to any person and preventing damage to property. *Id.* at p. 2.

AD 17-06 specifically requires if circumstances allow that before any chemical agent or other control device is used, the subject/inmate must be informed that the irritant or control device will be used unless he complies with orders. (ECF No. 21-10, p. 3). The policy also states that for a planned use of force, in situations that are non-emergency in nature, chemical agents are not to be utilized to manage inmates who are classified in eOMIS under health classification as a mental health code 3 or higher without first-consulting mental health staff.[1]  *Id.*

### III. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient

---

[1] It is not clear from the record whether Plaintiff is part of this classification.

evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id*. (citing, *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.  DISCUSSION

### A.  Failure to Exhaust Administrative Remedies

Defendants argue Plaintiff failed to exhaust his administrative remedies on his claims of excessive force, invasion of privacy, and a strip search before he filed the instant lawsuit and consequently his claims are barred.  This Court agrees.

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   Exhaustion is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."  *Id*. at 218 (internal quotation marks and citation omitted).  The Court stated the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim

to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

The Eighth Circuit has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (citing *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) (explaining a prisoner is only required to exhaust those administrative remedies that are available and any remedies that prison officials prevent a prisoner from utilizing are not considered available)).

There is no dispute the ADC/ORU had a grievance procedure in place for inmates to use at the time the incidents occurred which Plaintiff claims resulted in a violation of his rights.  There is also no dispute Plaintiff did not file any grievances related to his claims arising from the January 10, 2020, incident prior to filing the instant lawsuit.  Plaintiff's only explanation for not filing grievances on these issues was his "fear of retaliation".  (ECF No. 10, p. 2).

For the fear of retaliation to serve as a basis for excusing a prisoner from exhausting his administrative remedies there must be some information from which the court can determine that a reasonable prisoner of ordinary firmness would have understood that some threats or other actions by Defendants were made against the prisoner if he chose to utilize the prison's grievance system. *East v. Minnehaha County,* 986 F.3d 816 (8th Cir. 2021).  Other than Plaintiff's conclusory statement that he feared retaliation, he has not provided with Court with any specific facts or meaningful information concerning potential retaliation from Defendants Walter or Dallas.

11

Accordingly, the Court recommends Defendants Walter and Dallas be granted summary judgment based on Plaintiff's failure to exhaust his administrative remedies and all of Plaintiff's personal capacity claims against them be dismissed without prejudice.[2]

### B.  Official Capacity Claims

Plaintiff also sues Defendants Walter and Dallas – employees of the ADC, a division of the State of Arkansas - in their official capacities.  Official capacity claims against them are the functional equivalent of a suit against their employer.  *Zajrael v. Harmon,* 677 F.3d 353, 355 (8th Cir. 2012).  Absent waiver by the State or valid congressional override, the Eleventh Amendment bars a claim for monetary damages against a State in federal court.  *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Hadley v. North Arkansas Cmty. Tech. Coll.,* 76 F.3d 1437, 1438 (8th Cir. 1996).  The State of Arkansas has not consented to being sued in the federal courts, *Burke v. Benne,* 948 F.2d 489, 494-495 (8th Cir. 1991), and Congress did not override the states' sovereign immunity when it enacted 42 U.S.C. § 1983.  *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66-67 (1989); *Hadley,* 76 F.3d at 1438.  Thus, sovereign immunity bars Plaintiff from recovering any type of monetary relief from Defendants in their official capacity.

Accordingly, Plaintiff's official capacity claims against Defendants fail as a matter of law and the Court recommends these claims be dismissed with prejudice.  *Id.*

### V. CONCLUSION

For the reasons stated above, I recommend Defendants Walter and Dallas' Motion for Summary Judgment (ECF No. 21) be **GRANTED.**  Further, I recommend Plaintiff's personal

---

[2]Claims that are dismissed for failure to exhaust administrative remedies should be dismissed without prejudice.  *See Langford v. Norris*, 614 F.3d 445, 457 (8th Cir. 2010).  Because Plaintiff's personal capacity claims are being dismissed, the Court will not address the merits of these claims or the issue of qualified immunity.

capacity claims be **DISMISSED WITHOUT PREJUDICE** and Plaintiff's official capacity be **DISMISSED WITH PREJUDICE.**

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 27th day of September 2021.

/s/ *Barry A. Bryant*

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

13